IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| THOMAS CENTER OWNERS ASSOCIATION, | No. 80086-8-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| THE ROBERT E. THOMAS TRUST, and MICHAEL HYTOPOULOS, Trustee, | |
| Respondents. | |

LEACH, J. — Thomas Center Owners Association appeals an order granting partial summary judgment in favor of its landlord, the Robert E. Thomas Trust, and denying its motion to vacate an appraisal used to establish rent amounts for a ground lease. The Association claims the trial court should have decided as a matter of law that the appraisers proceeded on a fundamentally wrong basis by excluding the impact of soil contamination from their valuation.

Because the appraisers did not act arbitrarily and capriciously, they did not make their evaluation on a fundamentally wrong basis. We affirm.

FACTS

Robert E. Thomas owned commercial real estate (Thomas Center Property) on Mercer Island. In August 1963, Charles and Vicenta Sparling and George and Jean Donnally, entered into a 99-year ground lease with Thomas for the property and

Citations and pin cites are based on the Westlaw online version of the cited material.

purchased the improvements Thomas had built on it. Thomas created the Robert E. Thomas Trust in his will. It became the owner of the Thomas Center Property after Thomas passed away in 1976.

In July 1975, Sparling and Donnally assigned the ground lease to the John's Company. It created the Thomas Center Condominiums in 1976.

In 1985, John's Company assigned the ground lease to the condominium owners' association (Association). It is the current ground lease tenant. The ground lease provides for a rent adjustment every 10 years using an appraisal process:

> The amount of monthly rental payable by Lessees under paragraph 3.A above shall be adjusted on the 1st day of September 1973, 1983, 1993, 2003, 2013, 2023, 2033, 2043; and 2053, to an amount equal to six (6%) per cent per annum of the appraised fair market value of said leased premises, excluding buildings, and shall, for the 120 months next succeeding the commencement of each such [10-year] period, be the amount so determined by an appraisal; provided, however, that in no event will the monthly rental be less than $800.00 per month. At least sixty (60) days before the end of each said ten year period, the Lessor and Lessees shall jointly appoint one appraiser, and said appraiser shall appraise the leased premises at its fair market value, as of the date on which each such ten year period commences.
> . . .
> In the event that the parties are unable to agree on one appraiser, or in the event the valuation established by the one appraiser is unsatisfactory to either party, then the parties shall each appoint one appraiser and the two appraisers so selected shall appoint a third appraiser, and the appraised fair market value as determined by the three appraisers shall then be binding upon the parties hereto retroactively to the beginning of that ten year period.

In 2013, the Association and the Trust agreed to have Peter Shorett appraise the land to determine the new rent effective September 1, 2013. Shorett appraised the land at $5.5 million. He included in his appraisal report a limiting condition stating, "It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or

structures (including asbestos, soil contamination, or unknown environmental factors) that render it more or less valuable." In a letter dated September 20, 2013, Shorett told the parties that after he finished his appraisal he learned about a feasibility study that caused him to increase his valuation to $6.6 million. The Association did not accept the $5.5 million or the $6.6 million valuations.

In 2014, the Trust learned the Hadley Property, a property across the street from the Thomas Center Property, was contaminated by Tetrachloroethylene (PCE). A 2011 report prepared for a previous owner of the Hadley Property stated that a drycleaner and coin-operated laundry on the Thomas Property in the late 1960s and 70s was a recognized environmental condition. A recognized environmental condition "is the presence or likely presence of any hazardous substances or petroleum products on a property under conditions that indicate an existing release, a past release or the material threat of a release of any hazardous substances or petroleum products into structures on the property or into the ground, groundwater or surface water of the property."

In late 2014, the Trust had investigative testing done at the Thomas Center Property. It confirmed the presence of PCE and other degradient contaminants on the property. Hadley sued the Association, the Trust, and other parties for offsite contamination.

After learning about the contamination, the Association asserted the appraisement process could not go forward until the contamination issue was fully and finally resolved. In January 2015, the Association sued the Trust, seeking declaratory judgment that "it has no liability related to the contamination of the Thomas Center Property," and for an

injunction "enjoining the re-evaluation of Ground Lease rent until the nature and extent of the contamination and remediation liability has been determined."

In 2015, the trial court granted partial summary judgment forcing the Association to participate in the appraisement process:

> The plaintiff says a reliable appraisal simply can't be done when there is so much uncertainty about the amount of, and responsibility for, outstanding remediation costs. The defense doesn't necessarily disagree but says this is a question with which the appraisers, and not the court, should wrestle. If the appraisers determine the task is impossible, so be it. The Court would agree that the process should run its course - whether it leads somewhere or not - and the plaintiff should be participating in the process.

To comply with the court order, the Association appointed Ken Barnes as its appraiser, and the Trust appointed Anthony Gibbons as its appraiser. Barnes and Gibbons mutually appointed Murray Brackett as the third appraiser.

In January 2017, Brackett told counsel the appraisers were close to completing the work "without additional information about the contamination issue," and asked if the appraisers would be receiving further guidance or information on "this issue."

The Trust's counsel responded to Brackett suggesting the appraisers:

1.      Complete the appraisal analysis of the Thomas Center Property, as unimpaired as of the required appraisal date. Just so that task is done.

2.      Place an interim hold on the appraisal valuation of the property, as impaired, as of the appraisal date, pending completion of further studies and information which are now commencing...

3.      When your group is ready to prepare a final report, we request that

4

> the report be prepared in "DRAFT" form and that we and our clients have a reasonable opportunity to review, comment, question the report before your group prepares a final report.
>
> NOTE: For the sake of caution, I want to reiterate my position that as of the appraisal date, the contamination which has been there [for] decades was not known to the parties and [therefore] is not a relevant factor in valuation. I understand that Chris disagrees and that your group may disagree. I just want to make clear that I have not waived or conceded that point.

On November 12, 2018, the Association told the appraisers it did not know when the appraisers would receive additional information because of upcoming litigation dates. The Trust responded noting that "no new material information about the contamination itself is expected for the foreseeable future."

On December 31, 2018, the appraisal panel concluded the fair market value was $5.5 million as "clean." The panel noted this valuation was made with "ongoing litigation with respect to onsite environmental contamination" and that "[t]he best available information indicates that the issue of contamination became known after the revaluation date." The appraisal also noted:

> With regard to the retrospective receipt of information related to contamination, it is noted that the highest and best use of the property would call for a full investigation of the contamination, and ultimate clean-up. It is standard practice to appraise a property as clean, and then address contamination liability as a separate matter. Typically, when development property such as this sells in the market place, the price of the property is differentiated from the cost of clean-up. The price paid for the property, as clean, is then used to help fund clean-up, presuming the owner is responsible for the cost of clean-up. Typically, relevant funds would be escrowed pending development of the project, and the money used to clean up the site during the development process. In this manner other sources

of clean-up funds can be obtained from potentially liable parties, and insurance proceeds, if any.

We reiterate that issues of liability and related impacts to fair market rent will be dealt with in the ongoing litigation, outside of the market rent determination process.

The Association's appraiser dissented. He agreed with the "clean" valuation but stated the panel did not have enough information to provide an "as is" valuation.

From September 1, 2013, through June of 2017, the Association paid $27,500 per month in rent based on Shorett's original 2013 appraisal. On July 1, 2017, the Association reduced its monthly rent payment to $10,000 per month. This resulted in a rent reduction of $385,000 for the period from July 1, 2017, to April 2019.

On March 4, 2019, the Association asked the court to vacate the appraisal decision. In response, the Trust asked the court to enforce the lease adjustment provision using the appraisal and to award the Trust back rent and interest.

The trial court granted the Trust's request on summary judgment. The trial court found that the process as completed was not fundamentally wrong and also found that the appraisal panel did not fail to follow directions.

The Association appeals.

STANDARD OF REVIEW

The Association appeals the trial court's summary judgment decisions granting the Trust's requests and denying its own. We review an order granting summary judgment de novo.[1] Summary judgment is appropriate when "there is no genuine issue as to any

---

[1] Loeffelholz v. University of Washington, 175 Wn.2d 264, 271, 285 P.3d 854 (2012).

material fact" and "the moving party is entitled to a judgment as a matter of law."[2]  We view the evidence in the light most favorable to the nonmoving party.[3]

ANALYSIS

Fair Market Value

The Association claims that an appraisal to determine "fair market value" must consider soil contamination as part of the determination.  Because the challenged appraisal did not do this, the Association asserts that controlling case law requires that the trial vacate it.  The Trust responds that the appraisers followed the lease, exercised their professional discretion, and acted within that discretion to decide the contamination would not be considered in determining fair market value because it "is standard practice to appraise a property as clean, and then address contamination liability as a separate matter."

The parties agree on the standard our courts use to review a challenged appraisal but disagree about the application of that standard to the facts of this case.  "[I]n the absence of mistake, arbitrary or capricious action or fraud, the decision by such an appraiser is conclusive upon the parties. Only where the appraiser has proceeded upon a fundamentally wrong basis may the court ignore the appraiser's findings."[4]  This court has explained an "appraiser may not ignore the express terms of a contract" and doing

---

[2] CR 56(c); Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008).

[3] Loeffelholz, 175 Wn.2d at 271.

[4] Black Mountain Ranch v. Black Mountain Development Co., 29 Wn. App. 212, 216, 627 P.2d 1006 (1981).

so is evidence that the appraiser proceeded on a "fundamentally wrong basis."[5] So, we must decide if the appraisers acted in an arbitrary and capricious manner and ignored the terms of the lease by excluding consideration of contamination when determining "fair market value." Arbitrary and capricious action is the "willful and unreasoning action without consideration and in disregard to facts and circumstances."[6] Action is not arbitrary and capricious where there is room for two opinions even though one may believe an erroneous conclusion has been reached.[7]

The ground lease does not define "fair market value." The lease also does not specify a method an appraiser must use to determine "fair market value." Washington State courts define "'Fair market value' is the amount of money which a well informed buyer, willing but not obliged to buy the property, would pay, and which a well informed seller, willing but not obligated to sell it, would accept, taking into consideration all uses to which the property is adapted and might in reason be applied."[8]

The Association correctly notes that in Washington, a seller of unimproved residential property must inform a buyer of "any substances, materials, or products in or on the property that may be environmental concerns . . . or contaminated soil or water."[9] And, the Association also notes that in condemnation proceedings, property is usually

---

[5] Chatterton v. Business Valuation Research, Inc., 90 Wn. App. 150, 157, 951 P.2d 353, 357 (1998).

[6] Bennett v. Board of Adjustment of Benton County, 29 Wn. App. 753, 755, 631 P.2d 3 (1981).

[7] Bennett, 29 Wn. App. at 755 (citing Matter of Stockwell, 28 Wn. App. 295, 302, 622 P.2d 910 (1981); King County v. Washington State Bd. of Tax Appeals, 28 Wn. App. 230, 241, 622 P.2d 898 (1981); Zoutendyk v. Washington State Patrol, 27 Wn. App. 65, 616 P.2d 674 (1980)).

[8] State v. Rowley, 74 Wn.2d 328, 334, 444 P.2d 695 (1968).

[9] RCW 64.06.015.

valued under the zoning that existed on the date of possession unless a reasonable probability exists that the zoning will change in the near future, and such change is not caused by the project for which the property is being acquired.[10]

This case presents an unusual use of an appraisal. The parties acknowledge that a 99-year ground lease with rent to be readjusted every 10 years using an appraisal and a fixed rate of return is uncommon. Also, the contamination issue here is complex, and the applicable law was largely undeveloped at the time the lease was written. The land became contaminated sometime between the years 1961 and 1978. At the time, the rent was to be readjusted in 2013, but the Trust claims it was unaware of the contamination. And, at the time of the December 2018 appraisal report, the contamination litigation was ongoing.

The panel here followed the Uniform Standards of Professional Appraisal Practice (USPAP) in preparing their report. The USPAP states that appraisals of contaminated properties are sometimes developed on an assumption, while extraordinary, that the property is free of contamination. The USPAP states that a "clean" appraisal is an acceptable practice under certain conditions.

The panel's December 2018 appraisal report indicated, "[s]ince no Phase I assessment was available at the renewal date, a rent renewal appraisal, if prepared at that time, would not have included any comment on contamination, other than to assume there was none as a standard limiting condition."

---

[10] State v. Kruger, 77 Wn.2d 105, 107-08, 459 P.2d 648 (1969); State v. Sherrill, 13 Wn. App. 250, 261-62, 534 P.2d 598 (1975).

The report also stated, "As of our date of value, the liability issues were unknown and, therefore, unresolved. It is standard appraisal practice to assume that a site is clean, absent information to the contrary. Our appraisal analysis, reflecting an opinion of Fair Market Value without consideration of the future environmental issues, would have come to the following determination of rent under the terms of the lease." The report continued, "It is standard practice to appraise a property as clean, and then address contamination liability as a separate matter." The Association did not present any evidence that the panel's statement was incorrect. So, it did not demonstrate any issue to whether the panel acted within the discretion given to appraisers under the USPAP.

This case is not like Chatterdon where the court found the appraiser's valuation method frustrated the intent of the parties.[11] Here, the Association made no showing the soil contamination impaired its use of the leased property. Also, it made no showing the amount of rent charged using the appraised value varied from the rents charged to tenants of similar properties. Finally, the appraisal did not frustrate the parties' intent regarding contamination. As contemplated by the appraisal, the economic consequences of the contamination for each party will be determined in pending litigation.

Deducting the estimated cleanup costs from the "clean value" to produce the appraised value, used to calculate rent, would have the Association leasing the property for $800 per month. Apparently, recognizing the inequity of this position at oral argument the Association expressly disavowed this approach. It stated the appraisers should exercise their discretion to determine how to adjust the property's value because of the

---

[11] 90 Wn. App. 150, 951 P.2d 353, 357 (1998).

presence of contaminated soil.  This is what the panel did.

Because it is a standard practice to appraise a property as clean, and given the unusual facts of this case, the panel did not act arbitrarily and capriciously when it evaluated the fair market value as "clean." The Association failed to show any issue about whether the panel completed the appraisal process on a fundamentally wrong basis or that the appraisal panel failed to follow directions.

## CONCLUSION

We affirm.  Because it is industry standard, based on context to appraise a property as "clean," the appraisal panel did not act arbitrarily or capriciously.

_____
Leach, J.

WE CONCUR:

_____

_____
Dwyer, J.

11